E-FILED

Friday, 23 March, 2007  02:31:07 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| MICKEY A. WALKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 06-3006 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on cross motions for summary judgment for review of the Social Security Administration's final decision denying Plaintiff Mickey A. Walker's application for Disability Insurance Benefits (DIB) under the Social Security Act, 42 U.S.C. §§ 416(i) and 423, for the period after December 31, 1994, the date on which Walker was last insured.  See Plaintiff's Motion for Summary Judgment (d/e 11) (Plaintiff's Motion); Defendant Jo Anne B. Barnhart Commissioner of Social Security's (Commissioner) Motion for Summary Affirmance (d/e 16) (Commissioner's Motion).  Walker filed the DIB application at issue on January 15, 2003,

alleging an onset date of October 27, 1988.[1]  The application for DIB was denied.  He appealed on April 23, 2003 for reconsideration.  On June 9, 2003, the Commissioner denied his request for reconsideration.  On July 1, 2003, he requested a hearing before an Administrative Law Judge, which was held April 8, 2005.  The Administrative Law Judge (ALJ) heard testimony from Walker, from Walker's wife, and from vocational expert Bonnie Gladden.  On May 27, 2005, the ALJ issued his decision denying Walker's application for DIB.  For the reasons set forth below, the Court reverses the decision of the Commissioner and remands this matter for further proceedings.

## BACKGROUND

Walker was born on September 8, 1943.[2]  He has a high school education.  He worked as an assembler of tractors at Caterpillar, Inc. from February 1966 until October 27, 1988, when he was discharged due to

---

[1]The record reveals that Walker previously applied for DIB four times, the most recent of which is in September 2000.  The 2000 application was denied.  Walker did not pursue the claim any further.

[2]The Court notes that the time period under consideration by the ALJ was on and before December 29, 1994, the date on which Walker was last insured.  That is, the issue before the ALJ was whether Walker was disabled on and before December 29, 1994.  In summarizing Walker's medical history, however, the Court will outline Walker's medical history until 2004, for the sake of completeness, as the record contains medical records up to 2005.

various ailments.  In 1977, he fell approximately 30 feet from a ladder and fractured his knees, wrists, and nose.  Certified Record of Proceedings (d/e 8) (hereinafter R.) at 200.  On June 6, 1977, Walker underwent surgery for his wrists and lower legs, which was performed by Dr. Walter Baisier, who noted that Walker had tolerated the procedure well and returned to the recovery room in good condition.  Id. at 199.  Walker again underwent surgery of his left wrist on November 1, 1977.

Walker has a history of back pain dating back to 1974, when he experienced pain playing softball.  On March 8, 1976, Walker was admitted to the hospital because of moderately severe back pain.  Walker's treating physician observed "tenderness over the lumbosacral area on pressure.  The tendon reflexes were slightly decreased on both sides.  There was slight decreased strenth [sic] on adduction and abduction of the big toe on both sides."  R. at 209.  An X-ray demonstrated minimal osteoarthritic changes of the thoracic spine.  Walker was given medication and placed on traction. He was discharged six days later because his condition improved.

Walker experienced back pain again in June 1979 when he bent over to pick up a child.  Dr. Baisier diagnosed him as having a resolving rupture disc L-5, on the left side.  On June 24, 1979, Walker was admitted to the

hospital after sustaining a back sprain at work.  Walker relayed that the pain radiated to his legs.  X-rays revealed no abnormality.  Walker's condition improved after a week and so he was discharged.  R. at 208.

In 1982, Walker was treated for severe back pain.  The physician advised him to avoid lifting heavy objects and prescribed physical therapy for back flexing exercises.

On May 27, 1986, Dr. Frank L. Mikell examined Walker for hypertension and headaches.  The physician noted that Walker was recently diagnosed with hypertension and that his medication was not relieving his symptoms.  He recommended that Walker undergo "a digital subtraction angiogram of the renal arteries to exclude any significant renal artery stenosis."  R. at 218.  On June 3, 1986, Walker underwent the recommended procedure, the results of which showed no remarkable abnormality.  Dr. Mikell further recommended Walker to "keep in contact with [Dr. Helmust W. Hess] for checks of his blood pressure and also periodic checks of his potassium on the diuretic."  Id.  He opined that Walker had "essential hypertension", warranting continued medical therapy. Dr. Mikell noted that Walker's renal arteries were normal.  Id. at 217.

Dr. Hess, Walker's treating physician, referred Walker to Dr. M.L.

Mehra for his headaches and elevated blood pressure.  Walker was examined by Dr. Mehra on June 23, 1986, during which time Dr. Mehra noted that Walker had been experiencing throbbing headaches for three weeks.  On examination, Dr. Mehra reported that tests showed no evidence of abnormality.  At follow-ups on July 7, July 21, and August 1, 1986, Dr. Mehra reported changes in Walker's medication.  At a follow-up on September 24, 1986, Dr. Mehra diagnosed Walker with essential hypertension and chronic tension headaches.  Walker returned to Dr. Hess on October 24, 1986, at which time Dr. Hess noted that Walker had no recurrent headaches, his blood pressure was 140/80, and his neurological exam was normal.

While pushing a heavy object at work, Walker injured himself on March 31, 1987.  He subsequently experienced low back and left leg discomfort.  In April 1987, a computerized tomography (CT) scan showed no evidence of abnormality.  On May 6, 1987, Walker was treated by Dr. Edward Trudeau for his back pain and left leg discomfort.  Walker related that he had difficulty lying on his back, sitting for an extended period of time, and standing.  On examination, Dr. Trudeau reported "markedly positive straight leg raising test on the left side at approximately 70° with

discomfort felt in the low back and left leg." <u>R.</u> at 228.  He also observed that Walker had "marked tenderness to palpation over the left low lumbosacral paraspinal region and over the course of the sciatic nerve and left buttock."   <u>Id.</u>   Dr. Trudeau reported that Walker may have radiculopathy and so recommended a detailed electroneurophysiologic studies.  Walker underwent the recommended exam, and following the exam, Dr. Trudeau reported the findings in part as follows: "The findings on electrodiagnostic studies are those of left S1 root irritation of fairly mild extent in eclectroneurophysiologic testing quantification.  There was no evidence of other lumbosacral radiculopathy or of peripheral entrapments or of peripheral neuropathy . . . ." <u>Id.</u> at 229.  Dr. Trudeau concluded that Walker may have a soft disc or a disc abnormality at L4-5 or L5-S1, which may be causing the left S1 root irritation.  Dr. Trudeau suggested a conservative treatment plan for Walker's condition and recommended a referral to Dr. Baisier, an orthopedist, and physical therapy outpatient sessions.

On May 27, 1987, at the direction of Dr. Baisier, Walker underwent an MRI, which showed degenerative disc at L4-5 and lubmosacral level with light bulging, but no isolated disc herniation.

On June 15, 1987, Walker was hospitalized because of lower back pain. The lumbar myelogram and CT scan were normal. He was discharged on June 17, 1987. On July 27, 1987, Walker returned to see Dr. Baisier complaining of back pain and informed Dr. Baisier that application of pressure on his back relieved the pain.

In October 1988, a chest X-ray revealed osteoarthritic changes of the thoracic spine. Also, sometime in 1988, Walker was diagnosed with diabetes.

On March 7, 1989, Walker was admitted to the hospital due to back pain following a sprain. A CT scan showed no significant abnormality. Walker's chest X-ray similarly showed no evidence of significant abnormality, but revealed osteoarthritic changes of the thoracic spine. Walker was placed on traction, which relieved his pain. On March 13, 1989, he was discharged because his condition improved. Walker was directed to continue physical therapy for three weeks.

In October 1989, Dr. H. W. Hess reviewed Walker's medical records and prepared a Physician's Statement of Disability for AETNA Insurance Company. In that statement, Dr. Hess diagnosed Walker with having bulging disc, arterial hypertension, diabetes mellitus, severe migraine

headaches, and "condition following fracture of both patellae and both wrists". R. at 839. Dr. Hess concluded that Walker was totally disabled from performing his regular occupation.

In December 1989, a chest X-ray again demonstrated osteoarthritic changes of the thoracic spine.

In the early part of 1990, Dr. Deogracias Quizon, Walker's treating physician, similarly prepared a Physician's Statement of Disability after reviewing Walker's medical records. In the statement, Dr. Quizon listed Walker's blood pressure reading of 170/110 and indicated that Walker had severe limitation of functional capacity and was incapable of minimal (sedentary) activity. R. at 835-36. Dr. Quizon opined that Walker was totally disabled.

On March 6, 1990, Walker underwent X-rays of cervical and thoracic spine, which showed severe degenerative changes involving the lower thoracic spine.

In a letter dated June 7, 1991, Dr. Quizon opined that Walker was incapable of performing the following occupations suggested by the long term disability insurance carrier: (1) Laminator, D.O.T. 554.685-030; (2) Injection Molding Machine Operator, D.O.T. 556.685-038; and (3)

Hydraulic Press Operator, D.O.T. 583.685-058.[3]

From November 22, 1991, until November 23, 1991, Walker was hospitalized because of chest discomfort, shortness of breath, and dizziness. Walker underwent catheterization, which "demonstrated normal LV systolic function, no coronary blockages and no significant coronary spasm with ERGONOVINE testing." R. at 324. Dr. Wilfred Lam suggested that if the chest pain persisted, Walker should undergo tests for non cardiac sources of chest pain such as cervical spine X-ray, upper GI, and esophagram. Id. The doctor also noted that because Walker's blood pressure was on the high side, he should closely follow-up with Dr. Quizon.

On March 27, 1992, Walker was again admitted to the hospital due to severe back pain, muscle spasms, and a limited range of motion. A CT scan of the lumbar spine showed no indication of bulging or herniated disc, but revealed "[m]ild osteoarthritic changes of the body of L-4." Id. at 567. An X-ray of the lumbar spine demonstrated mild osteoarthritic changes of L-3, 4 and 5.

On June 14, 1992, Walker was treated for shoulder pain. Id. at 554.

---

[3]The Court notes that all of these positions are considered light in terms of physical demands. See R. at 821-25.

An X-ray of the left shoulder showed no signs of fracture, dislocation or other bone or joint pathology.

In October 1992, Dr. Quizon reviewed Walker's medical records and prepared a "Statement of Functional Capacity" for Metropolitan Life Insurance Company in which he reported that Walker's primary diagnoses affecting work ability were hypertension, arthritis, and Type II diabetes and that his secondary diagnoses affecting work ability were herniated disc L4 and L5, and traumatic arthritis. He listed Walker's blood pressure reading of 180/100 under the space provided for "Objective Findings (including test results)". Dr. Quizon opined that Walker had some limitations in the following activities: (1) change of position (sitting/standing), (2) reaching (forward/overhead), (3) pushing/pulling/twisting (arm/leg controls), and (4) grasping/handling. He further opined that Walker should avoid completely the following activities: (1) sitting; (2) assuming cramped/unusual positions; (3) reaching (forward/overhead); (4) repetitive movement (hands/feet); (5) climbing (stairs/ladders/scaffolds); (6) balancing (exposure to falling); (7) bending/stooping/squatting; (8) operating truck/dolly/small vehicle, heavy equipment, and electrical equipment; and (9) performing concentrated visual attention. Dr. Quizon concluded that Walker was "totally disabled".

On June 14, 1993, Dr. Bradley Wood, a medical examiner, prepared a medical examination form, opining that Walker was unable to work due to severe hypertension.  R. at 742.

In October 1993, Dr. Quizon again prepared a functional capacity statement, reporting the same diagnoses and activity restrictions he had noted earlier and listing Walker's blood pressure reading of 186/110 under "Objective Findings".

On August 30, 1993, Walker saw Dr. David G. Dodwell due to blurry vision in his right eye.  On examination, Dr. Dodwell reported: "Dilated fundus examination of the right eye reveals a normal optic disc, retinal vessels, macula and peripheral retina.  No arteriolar emboli are present and the optic nerve is otherwise unremarkable.  No significant diabetic retinopathy is observed in either the right or left eye.  Dilated funds examination of the left eye reveals a comparatively normal optic disc, retinal vessels and peripheral retina."  R. at 373.  Dr. Dodwell concluded that Walker's symptoms were consistent with amaurosis fugax and suggested that he should see Dr. Quizon for further optometric care.

A chest X-ray was taken on December 10, 1993, which showed marked osteoarthritic changes of the thoracic spine.

On August 15, 1994, Walker was admitted to the hospital due to headache, chest pain, and high blood pressure. X-rays showed osteoarthritic changes in the thoracic spine.

Dr. Quizon completed another functional capacity statement sometime in October 1994, noting essentially the same activity restrictions and diagnoses he had noted in the earlier statements. In this statement, however, Dr. Quizon reported that Walker was no longer completely precluded from performing forward and overhead reaching. Under "Objective Findings", Dr. Quizon noted Walker's blood pressure reading of 186/100 in the 1994 statement. Dr. Quizon opined that Walker was totally disabled.

In April 1995, Walker was examined by cardiologist Dr. Robert S. Rosenstein. Dr. Rosenstein opined that Walker had uncontrolled hypertension. The physician recommended changes in Walker's medication.

In October 1995, Dr. Quizon again prepared a functional capacity assessment after reviewing Walker's medical records. The 1995 statement was identical to the 1994 statement, except for Walker's blood pressure reading of 200/100.

In May 1996, Walker was admitted to the hospital for severe headache, neck pain, dizziness, and elevated blood pressure at 230/120. Dr. Richard E. Katholi noted that a CT scan of the neck indicated some arthritic changes and that Walker had poorly controlled Type II diabetes mellitus. At that time, Walker underwent echocardiogram, the results of the tests were consistent with his history of hypertension. Dr. Katholi recommended a multi-drug therapy to keep the symptoms under control.

In June 1995, Walker was hospitalized, complaining of back pain. Walker explained that he attempted to lift his mower when it got stuck, but that he did not experience any pain until the mower hit a bump, jarring his back. A CT scan of the lumbar spine showed bulging disc "at the level L5-S1 anteriorly with slight impression of the thecal sac." R. at 517.

In December 1996, after reviewing Walker's medical records, Dr. Quizon completed another functional capacity statement. Under the space provided for "Objective Findings", Dr. Quizon did not list anything. As he had done previously, Dr. Quizon noted that Walker's primary diagnoses affecting work were hypertension, Type II diabetes, and traumatic arthritis and that his secondary diagnosis affecting work was herniated disc. Dr. Quizon reported that Walker had no limitation in finger dexterity, but had

some limitations in the following activities: (1) change of positions (sitting/standing), (2) pushing/pulling/twisting (arm/leg controls), (3) grasping/handling, and (4) using repetitive movements (hands/feet). Dr. Quizon noted that Walker should avoid completely the following activities: (1) standing; (2) sitting; (3) assuming cramped/unusual positions; (4) climbing (stairs/ladders/scaffolds); (5) balancing (exposure to falling); (6) bending/stooping/squatting; (7) operating truck/dolly/small vehicle, heavy equipment, and electrical equipment; and (8) performing concentrated visual attention. Dr. Quizon concluded that Walker was completely disabled and unable to work.

In October 1997, Dr. Quizon similarly completed another functional capacity statement in which he reported the same things he had noted in the 1996 statement, except that under "Objective Findings", he listed Walker's blood pressure reading of 200/100. He further noted that Walker had some limitations in only the following three activities: pushing/pulling/twisting (arm/leg controls), grasping/handling, and repetitive movements (hands/feet). He reported that Walker should avoid completely the remainder of the activities listed on the form.

Sometime in 1997, Walker was hospitalized because of severe

headache and elevated blood pressure.  He was discharged a few days later because his condition improved.  On March 24, 1998, Dr. Quizon treated Walker for severe headaches.  Walker returned to Dr. Quizon on June 20, 1998, at which time Dr. Quizon observed that Walker had erectile dysfunction probably due to his diabetes mellitus.  Walker was advised to follow a low salt diet.

In August 1998, Walker was again admitted to the hospital due to severe headaches and elevated blood pressure.  He was discharged a few days later when his condition improved.

Dr. Quizon prepared a functional capacity statement in 1999, reporting the same things he had earlier noted.  In the 1999 statement, however, Dr. Quizon noted that Walker had no limitation in repetitive movement (hands/feet), but had some limitations in pushing/pulling/twisting (arm/leg controls), grasping/handling, finger dexterity, and climbing (stairs/ladders/scaffolds).  Dr. Quizon noted that Walker should avoid completely the following activities: transportation, standing, sitting, assuming cramped/unusual positions, reaching (forward/overhead), balancing (exposure to falling), bending/stooping/squatting, operating truck/dolly/small vehicle, heavy

equipment, and electrical equipment, and performing concentrated visual attention. Under "Objective Findings", Dr. Quizon noted Walker's blood pressure reading of 200/100. Dr. Quizon concluded that Walker was completely disabled.

A radiology report dated January 19, 1999, indicated that Walker's right knee showed degenerative arthritis and that there was a "slight increase in the degree of joint space narrowing involving the medial aspects of the joint when comparison is made with the examination dated 11/3/98." R. at 468.

On February 1, 1999, Walker was admitted to the hospital again due to severe headache and dizziness. Dr. Quizon diagnosed Walker as having severe hypertension, Type II diabetes mellitus and a history of degenerative joint disease. Walker was discharged a few days later when his condition improved.

Walker has a history of knee osteoarthritis and was treated conservatively for this condition with anti-inflammatories, ambulatory aids, and intraarticular cortisone injections. Because conservative therapy failed to relieve the problem, Walker underwent a right total knee arthroplasty, without any complications on March 18, 1999. Dr. Gordon Allan, who

performed the surgery, observed that Walker had excellent motion.  An X-ray revealed that the right total knee replacement was in good condition, but that the left knee showed osteoarthritis with "narrowing of the joint space medially and old wire fixation of the patella."  R. at 592.

At a follow-up on June 16, 1999, approximately three months after the surgery, Walker informed Dr. Allan that he was doing very well and that he had no complaints.  Dr. Allan accordingly noted that Walker was doing very well after the surgery.

Walker returned to see Dr. Allan on September 15, 1999, at which time Walker reported that he was doing well.  Dr. Allan noted in his evaluation that Walker was satisfactorily progressing after his right total knee arthroplasty and that his range of motion was from 15 to 115 degrees.

 Walker was again admitted to the hospital, in September 1999, for a 23-hour observation due to chest pain that radiated to both arms, headache, and nuchal pain. Dr. Quizon noted that "EKG showed a lot of ischemic changes". R. at 453.  Dr. Quizon's final diagnoses were as follows: (1) chest pain with mild myocardial ischemia, (2) hypertension, (3) Type II diabetes mellitus (poorly controlled), and (4) cervical spine arthritis.

Dr. Quizon reviewed Walker's medical records and completed a

17

functional capacity statement in February 2000.  Dr. Quizon noted the same diagnosis and activity restrictions he had noted in the 1999 statement.

On March 23, 2000, Walker was admitted to the hospital due to another episode of headache and hypertension.  His blood pressure reading at that time was 190/115.  Dr. Quizon increased Walker's medication to control his hypertension and diagnosed Walker as having labile hypertension, Type II diabetes, which was poorly controlled, mild BPH, and a history of degenerative joint disease.  R. at 629.

In April 2000, Walker was again admitted to the hospital due to high blood pressure, headache, and chest discomfort.  Dr. Quizon observed that Walker was suffering from side effects from anti-hypertensive medications and that he failed to comply with diet restrictions for his hypertension and diabetes.   After a 23-hour observation at the hospital, Walker was discharged.

In December 2000, Walker suffered a stroke, which affected the right side of his body, from which he recovered about 95 percent.

Walker's medical records were reviewed by Dr. Boyd E. McCracken, a state agency medical consultant.  In a report issued November 2, 2000, Dr. McCracken reported that Walker was not disabled through December

18

31, 1994.  <u>R.</u> at 67.  The physician noted in the report that Walker's primary diagnosis was essential hypertension and that his secondary diagnosis was diabetes mellitus.

In March 2001, Dr. Quizon prepared a functional capacity statement after reviewing Walker's medical records.  This time, the doctor noted a blood pressure reading of 190/94 under "Objective Findings".  He did not check off any activities under "No Limitation."  He noted that Walker had some limitations in finger dexterity, repetitive movement (hands/feet), and climbing (stairs/ladders/scaffolds), and that Walker should avoid completely the rest of the listed activities.  <u>R</u>. at 716.  The doctor concluded that Walker was totally disabled.

Walker experienced pain on his left knee.  He saw Dr. Edmund W. Raycraft for the problem.  On January 15, 2002, an x-ray showed evidence of significant osteoarthritis on the left knee.  In March 2002, Walker underwent a left total knee arthroplasty.

In May 2002, Dr. Quizon prepared a functional capacity statement in which he noted a blood pressure reading of 160/74 and reported the same activity restrictions and diagnoses as he had done in the 2001 statement.

Dr. Raycraft conducted a follow-up on July 12, 2002. He observed

that Walker still had limitations with motion, but that he was undergoing physical therapy treatment.

During a physical therapy treatment, Walker experienced unsteadiness of gait with some balance being lost. In July 2002, Dr. Quizon therefore referred Walker to Dr. Rana H. Mahmood, a neurologist, for lower extremity symptoms and gait unsteadiness. On July 30, 2002, Walker underwent an EMG and Nerve Conduction study of the lower extremities. The results of the study were abnormal. Dr. Mahmood opined that Walker had "[m]oderately severe bilateral carpal tunnel syndrome, slightly worse on the left side, with no evidence of superimposed cubital tunnel syndrome, radiculopathy, peripheral neuropathy, plexopathy, or disease at the muscle level." R. at 852.

Dr. Mahmood instructed Walker to get an MRI of his brain to determine whether his prior stroke contributed to the balancing problem. On August 14, 2002, an MRI of the brain with contrast showed evidence of chronic small vessel ischemic changes, pansinusitis, and cephalomalacia in the anterior aspect of the pons. R. at 867.

On September 23, 2002, Walker saw Dr. Henrik Mike-Mayer, an orthopaedic spine surgeon, for his ambulation problem. Walker informed

Dr. Mike-Mayer that he had problems with ambulation when he was touching objects with his upper extremities and that he had numbness and tingling of his right hand, but that he had no neck or back pain or any pain radiating into the upper or lower extremities.  After conducting several tests, the doctor assessed that Walker had: (1) ambulatory dysfunction, (2) severe spinal stenosis C4-5, C5-6, C6-7, (3) C5-6 and C6-7 disc degeneration, and (4) mild residual right side weakness due to a prior stroke.  R. at 905.

On October 7, 2002, Walker was again examined by Dr. Mike-Mayer, who advised him that he had a severe cervical spine stenosis and subsequent ambulatory dysfunction.  The physician scheduled Walker for a C5 and C6 corpectomy and C4 to C7 anterior cervical reconstruction and fusion with plate fixation.  Walker underwent the scheduled procedure on November 3, 2002.

At a follow-up on November 11, 2002, Walker related that he had noticed more steadiness on his feet since surgery and that he did not have to hold onto walls or items with his upper extremities to help maintain balance.  Walker returned to Dr. Mike-Mayer for subsequent follow-ups.

Walker's medical records were reviewed by Dr. Victoria J. Dow, a state agency medical consultant.  In a report issued April 4, 2003, Dr. Dow

concluded that Walker was not disabled through December 31, 1994. The physician noted in the report that Walker's primary diagnosis was essential hypertension and that his secondary diagnosis was diabetes mellitus.

Walker underwent physical therapy treatment to increase his cervical spine, range of motion, and strength. Adrienne Lauff, physical therapist, noted that Walker's rehabilitation potential was good.

Walker returned to Dr. Mike-Mayer for a follow-up on May 5, 2003, approximately six months after the surgery. Walker informed Dr. Mike-Mayer that he was doing very well; that he was very pleased with the results; that he noticed a decrease in an overall range of motion of the cervical spine (although not significantly functionally limiting); and that he had returned to full and unrestricted activity levels. The doctor noted that Walker had mild restriction of cervical range of motion in rotation, but that he had excellent clinical and radiographic results, that he had full motor power in the upper extremities, and that he may continue with full and unrestricted activity. R. at 893.

Dr. Henry F. Rohs, a state agency medical consultant, reviewed Walker's medical records. In a report issued June 2, 2003, Dr. Rohs concluded that Walker was not disabled through December 31, 1994. The

22

physician noted in the report that Walker's primary diagnosis was essential hypertension and that his secondary diagnosis was diabetes mellitus.

On March 8, 2004, Walker underwent a physical therapy session. The therapist noted that Walker's "bilateral lower extremity gross muscle strength equal[ed] 3+ out of 5 and bilateral lower extremity active range of motion equal[ed] within functional limits. Right upper extremity active range of motion for the shoulder [was] limited to 95 degrees flexion and 150 degrees active range of motion of the left upper extremity for flexion. [Walker's] bilateral upper extremity gross muscle strength for biceps, triceps equal[ed] 3+ out of 5." <u>R</u>. at 974.

On April 8, 2005, the Social Security Administration's ALJ held an evidentiary hearing on Walker's application. Walker testified at the hearing. He stated that he lived with his wife in a single-story house that he owned. He said that he had no dependent children. He stated that on June 7, 1977, he fractured his knees, wrists, and nose as a result of a fall.

He said that he used to work as a tractor assembler at Caterpillar. He said that he stopped working on October 27, 1988, and that he has not worked since that date. He said that he became sick at work on that date at work and was examined by Dr. Hess who stated that he was close to

23

having a stroke.  He stated that due to his medical problems, Caterpillar assigned him to different types of jobs, including building cabs for graders, a job that required him to lift between 45 to 50 pounds, which was difficult for him to do.  He stated that even after he stopped working, he continued to experience pain in his wrists, knees, and back.  He stated that he has seen doctors for his low back pain and was hospitalized more than once due to this condition.

He testified that sometime after 1994, he suffered a torn rotator cuff and underwent four surgeries as a result.  He stated that he underwent total knee replacements for both his knees, right knee in 1999 and left knee in 2000.

On examination by his counsel, Walker stated that he has had blood pressure problems that began in the mid-1980s.  He also suffered from frequent headaches and nosebleeds.  In addition to these problems, he stated that he had knee and wrists problems during his employment at Caterpillar.  He stated that the pain in his left wrist was more severe than the pain in his right wrist.  He underwent additional surgery on his left wrist because he had difficulty turning his hand.

He also said that he had difficulty standing straight without holding

onto something to maintain balance.  He said that he had undergone neck surgery.  He stated that he had difficulty turning his head.  Walker stated that his doctors have had problems controlling his blood pressure.  He said that his medication did not relieve his hypertension.  He said that after suffering from a stroke, his blood pressure had been under control, but that he suffered from other ailments.  He stated that he frequently missed work because of his health problems.   He was reprimanded for his excessive absences.

Walker's wife, Doris Walker, then testified.   On examination by Walker's counsel, she testified that while her husband was employed at Caterpillar, he frequently missed work because of his back and knee pain and high blood pressure.  She testified that her husband did not do any house chores.  He would simply sit on the couch after supper and would not even run the sweeper.   She stated that after he stopped working, he continued to complain of pain and his condition worsened.   Since he stopped working, he had balance problems and problems with his knees and back.

She stated that in late 1994, her mother-in-law was diagnosed with cancer and, as a result, her husband visited her in the nursing home daily.

She stated that he would have to sit when he went to visit his mother because he was unable to stand.  She said that her husband was recently told that his carpal tunnel was back.  She stated that her husband did not go shopping and that he had difficulty straightening out his legs when he would get up to walk.

A vocational expert Bonnie Gladden then testified.  The ALJ asked Gladden, in part:

> And I would ask you to assume an individual in his early fifties with a high school education, past work doing heavy and perhaps some medium assembly work in a tractor manufacturing company.  And assume further that the individual is limited on an exertional basis to light work, would only be expected to be able to lift more then [sic] 10 pounds frequently or 20 pounds occasionally.  That the individual would not be able to climb ladders, ropes or scaffolds and probably shouldn't operate hazardous machinery or work at unprotected heights given his blood pressure problems. Assume further too that the individual could not do overhead reaching with his non-dominant upper extremity.  Because of the exertion limitations it's clear he couldn't do his past work, but would there be other jobs he could do?

R. at 62-63.  Gladden responded affirmatively by stating that there were both light and sedentary jobs that would fit the hypothetical posited by the ALJ.  She specifically stated: "The DOT number 706687010, at the light level there's approximately 30,300, at the sedentary level there's

26

approximately 8,000." Id. at 63.  She further said: "Likewise, cashier work,

211462010, at the sedentary level there's approximately 7,000, at the light

there's approximately 68,000.  There's that of a hand packager, 920587018,

at the light level, unskilled, there are 19,291." Id.

Walker's counsel then asked Gladden about employer tolerances for

absenteeism.  She responded as follows: "The general expectation by the

Department of Labor is two to three unexcused absences per month.  And

while I have toured Caterpillar, I don't recall asking if they have accrual of

benefits for sick days or not.  But generally speaking most unskilled types

of work do not have accrued vacation days or sick days." R. at 64.  On

examination by the ALJ, Gladden confirmed that two to three unexcused

absences per month would be excessive.

The ALJ rendered his decision on May 27, 2005.  He followed the five

step analysis called for in the Social Security regulations (Analysis).  20

C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be

currently engaged in gainful activity.   20 C.F.R. §§ 404.1520(b),

416.920(b).  If true, Step 2 requires the claimant to have a severe

impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If so, Step 3 requires

a determination of whether the claimant is so severely impaired that he is

27

disabled regardless of his age, education, and work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d). The Listings of such severe impairments are set forth in the Listings. 20 C.F.R. Part 404 Subpart P, Appendix 1. The claimant's condition must meet the criteria in a Listing or be equal to the criteria in a Listing. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the ALJ to determine whether the claimant is able to return to his prior work considering relevant factors, including his residual functional capacity (RFC). 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the person is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004); Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ found that Walker met his burden at Steps 1 and 2 of the

Analysis.  He was not engaged in gainful activity during the period under adjudication and had a medically determined impairment or combination of impairments that limited his ability to perform basic work activities.  At Step 3, the ALJ found that the limitations on his ability were not so great as to render him disabled regardless of his age, education, and work experience.  The ALJ therefore concluded that Walker's impairments did not equal any of the conditions found in the Listings.

In assessing whether Walker's impairments were severe enough to equal an impairment listed in Paragraph A of Listing 1.02, the ALJ recognized that Walker sustained fractures of both wrists and both kneecaps in 1977 and that he underwent a knee replacement surgery of his right knee in 1999 and a knee replacement surgery of his left knee in 2002.[4]

---

[4]Section 1.02 reads:

*Major dysfunction of a joint(s) (due to any cause)*:  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.    Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or

B.    Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

Paragraph 1.00B2b reads:

> b.  *What We Mean by Inability to Ambulate Effectively*
>
> (1)  *Definitio*n.  Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.  (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2)  *To ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Paragraph 1.00B2c provides:

> c.  *What we mean by inability to perform fine and gross movements effectively.*  Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.  Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself,

The ALJ noted, however, that the record lacked medical evidence suggesting that Walker made complaints of or received treatment for knee problems during the relevant time period.  The ALJ observed that progress notes from a treating physician during the relevant time period did not show that Walker had difficulty walking during the relevant time period.  The ALJ therefore concluded that Walker did not meet Paragraph A of Listing 1.02.

In evaluating whether Walker met Paragraph B of Listing 1.02, the ALJ recognized that in April 1991, X-rays showed evidence of deformities and osteoarthritis in the left wrist and that Walker received treatment for left shoulder pain in 1992.  The ALJ noted, however, that "the record lack[ed] evidence of significant bilateral impairment in gross or five manipulation during the period at tissue."  R. at 23.  The ALJ therefore concluded that Walker did not meet Paragraph B of Listing 1.02.

The ALJ also found that the record evidence failed to show that Walker met Paragraphs A, B and C of Listing 1.04.[5]  The ALJ determined

---

the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

[5]Section 1.04 reads:
*Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the

that Paragraph A of Listing 1.04 was not met because there was no evidence showing that Walker "had spinal arachnoiditis or lumbar spinal stenosis during the period in question." R. at 24. The ALJ further noted that in May 1987, an electrical testing showed that Walker had mild irritation of the left S1 nerve root and a corresponding neurological examination revealed sensory deficits of the left foot consistent with that diagnosis. The ALJ noted that the same test, however, revealed normal muscle strength and reflexes. Based on these reasons, the ALJ concluded that Walker failed to meet Paragraphs B and C of Listing 1.04.

The ALJ then moved to Step 4, concluding that Walker retained the

---

cauda equina) or the spinal cord. With:

A.   Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B.   Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C.   Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

residual functional capacity to meet "the exertional requirements of light work through December 31, 1994[,]" but that he "could not perform any climbing of ladders, ropes, or scaffolds, reach overhead with the nondominant (left) upper extremity (due to his shoulder injury), or tolerate any exposure to hazardous machinery or unprotected heights (due to occasional dizziness)." R. at 26.[6]

In assessing Walker's residual functional capacity, the ALJ noted that the allegations regarding the severity of Walker's symptoms during the period at issue were not fully credible, particularly Walker's claims about his limited ability to walk and stand. The ALJ noted that the record evidence did not show that Walker was severely limited in his ability to walk and stand. The ALJ stated that the medical records during the relevant time period only showed that Walker had episodes of back pain, usually due to an injury, from which he recovered.

The ALJ did not give Walker's treating physicians' opinions (namely, the opinions of Drs. Hess and Quizon) regarding Walker's ability to work

---

[6]The Court notes that the ALJ's statement here contradicts his statement in Finding No. 6, which provides, among other things, that Walker had the overall lifting limitation of 10 pounds and that he was restricted to occasional standing and walking. R. at 28. This issue is more fully discussed infra.

controlling weight.  The ALJ stated that the treating physicians' statement that Walker was unable to work because he was disabled was not accompanied by specific functional limitations and so was not an opinion on a medical issue, but an opinion on the ultimate issue of disability which is reserved to the Social Security Administration.  The ALJ also noted that non-examining state agency medical consultants found Walker not to have had any functional limitations during the relevant time period.  The ALJ also discredited Walker's claim that he had constant problems with hypertension because the record lacked evidence on that issue.  Moreover, the ALJ reasoned that the fact that in June 1995 Walker sustained a back injury when he attempted to lift his lawn mower suggested "a lack of major problems with headaches or dizziness or the side effects of medication."  R. at 26.

The ALJ determined that Walker met his burden at Step 4 of the Analysis because he did not have any past relevant work that was within his residual functional capacity.  The ALJ then moved to Step 5 to determine whether Walker could have performed other work.  In so doing, the ALJ found that the Social Security Administration met its burden under Step 5 to prove that Walker could perform work available in the national economy.

The ALJ made this finding based on the testimony of the vocational expert and the Medical-Vocational Guidelines (Appendix 2, Subpart P, Regulations No. 4).  Thus, the ALJ concluded that Walker was not disabled on or before December 31, 1994.

Walker then appealed this decision to the Social Security Administration Appeals Council.  The Appeals Council denied the request for review thereby making the ALJ's decision the Social Security Administration's final decision for purposes of judicial review.

## ANALYSIS

This Court reviews the ALJ's decision to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence, and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ further must at least mininally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the relevant evidence.  Diaz v.

<u>Chater</u>, 55 F.3d 300, 308 (7th Cir. 1995).  Walker seeks reversal of the

Commissioner's decision on four grounds.  As forth below, the Court finds

that remand is warranted.

As an initial matter, Walker contends that the ALJ erred in concluding

that Walker remained able to perform work at a light exertional level based

on the fact that the ALJ's Finding No. 6 itself limited Walker to sedentary

work, thereby warranting a finding of disability under Grid Rule 201.12.

After having reviewed the record, the Court finds that the ALJ's decision is

internally inconsistent and therefore remand is necessary on this basis.  In

his Finding No. 6, the ALJ stated:

> On and before December 31, 1994, the claimant had the
> residual functional capacity to perform the exertional and non-
> exertional requirements of work except for any lifting or carrying
> of more than 10 pounds, more than occasional lifting or carrying
> of 10 pounds or less, and more than occasional standing and
> walking (exertional); and performing work requiring any
> climbing of ladders, ropes, or scaffolds, reaching overhead with
> the nondominant upper extremity, or exposure to hazardous
> machinery or unprotected heights (non-exertional) (20 CFR §
> 404.1545).

<u>R.</u> at 28.  Walker asserts that the above quoted functional limitations found

by the ALJ are consistent with the performance of sedentary work at most,

not light work.  Walker therefore argues that the ALJ should have found

him disabled during the relevant time period under Rule 201.12 of the Medical-Vocational Guidelines.  20 C.F.R. Part 404, Subpart O, App. 2, Rule 201.12.

The Commissioner, however, asserts that there is a typographical error in the ALJ's Finding No. 6, which essentially provided that on and before December 31, 1994, Walker had an overall lifting limitation of 10 pounds. It may be a typographical error, but the Court is not certain whether the alleged error is merely a typographical error.  See Alexander v. Barnhart, 287 F.Supp.2d 944, 965 (E.D. Wis. 2003).  The ALJ's decision is, in fact, internally inconsistent, particularly the ALJ's Finding No. 6.  The ALJ explained in the body of the decision that Walker retained the residual functional capacity to meet the exertional requirements of light work, but could not perform any climbing of ladders, ropes, or scaffolds, reach overhead with the nondominant (left) upper extremity (due to his shoulder injury), or tolerate any exposure to hazardous machinery or unprotected heights (due to occasional dizziness). R. at 26.  The ALJ, however, failed to specify in Finding No. 6 whether Walker had the residual functional capacity to perform light work during the relevant time period; he merely stated in Finding No. 6 that Walker "had the residual functional capacity

37

to perform the exertional and non-exertional requirements of work", without specifying whether Walker had the ability to perform light work during the relevant time period.  R. at 28.  The ALJ also concluded in Finding No. 6 that Walker had an overall lifting limitation of 10 pounds, which is contrary to the statement in the body of the decision.  In the body of the decision, the ALJ found that Walker had an overall lifting limitation of 20 pounds, not 10 pounds.  Id. at 26.

Moreover, in the body of the decision, the ALJ rejected Walker's allegation that "he was limited" in the ability to stand and walk.  The ALJ determined that the record lacked evidence to support Walker's claims.  The ALJ noted that the medical records during the time period at issue showed that Walker had occasional episodes of back pain, which was generally caused by an injury, from which he recovered.  The ALJ explained further that the records revealed that "there [were] long periods between them during which there is no record of complaints of significant back pain.  Also, the records have few if any references to knee problems during this period."  R. at 26.  Again, contrary to this finding, however, the ALJ stated in his Finding No. 6 that Walker retained the residual functional capacity of only occasional standing and walking.  The Court therefore cannot "track" the

38

ALJ's analysis with respect to Finding No. 6, which is clearly contrary to the statements in the body of the decision, and so must reverse. On remand, the ALJ must clarify the issues set forth above and fully articulate and clarify his reasons for his Finding No. 6.

Walker next argues that the ALJ failed to explain his rationale for rejecting the opinions of Walker's treating physicians, Dr. Quizon and Dr. Hess. The Court agrees that the ALJ failed to adequately explain his reasons for rejecting the opinions of Walker's treating physicians. Generally, a treating physician's opinions are entitled to controlling weight if they are supported by objective medical evidence and are not inconsistent with other evidence in the record. 20 C.F.R. § 404.1527 (d)(2); Social Security Ruling (SSR) 96-2p; Frobes v. Barnhart, 467 F.Supp.2d 808, 818 (N.D. Ill. 2006); Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). If the treating physician's opinion is not given controlling authority, it is considered using the factors applied to all medical opinion evidence and may be entitled to deference. Frobes, 467 F.Supp.2d at 819; 20 C.F.R. § 404.1527(d)(2); SSR 96-5p. If the treating physician's opinion relates to an issue reserved solely for the Commissioner, such as statements that the claimant is "disabled" or "unable to work", the ALJ may not simply disregard the statements, but

must analyze the opinion by taking into consideration the following factors applied to any other medical opinion:  "(1) the length of the treatment relationship and frequency of visits; (2) the nature and extent of the relationship, including the treatment given and extent of any examinations; (3) the supportability of the opinion in light of medical testing and the explanation given by the physician; (4) consistency with the rest of the record; (5) the physician's specialization; and [(6)] any other factors." Frobes, 467 F.Supp.2d at 818-19; 20 C.F.R. § 404.1527(d)(2)-(6).

Additionally, the ALJ must explain "the reasons for the weight []he has chosen to give the treating physician's opinion, supported by evidence in the record, and with enough specificity to permit subsequent review of the decision.  SSR 96-2p; SSR 96-5p.  If the ALJ concludes that the treating physician's opinion is inconsistent with other evidence, []he must explain the inconsistency."  Frobes, 467 F.Supp.2d at 819 (citing Clifford v. Apfel, 227 F.3d 863, 870-71 (7th Cir. 2000)); Gilkey v. Barnhart, 417 F.Supp.2d 949, 962 (N.D. Ill. 2006).

Here, the ALJ did not give controlling weight to the opinions of Dr. Quizon and Dr. Hess.  In rejecting the opinions of Walker's treating physicians, the ALJ did not identify the names of the treating physicians,

but only cited to the portion of the record that contained functional capacity assessments completed by Dr. Quizon, from 1990 through 2002, and a statement of disability prepared by Dr. Hess in October 1989.  Dr. Hess diagnosed Walker with bulging disc, arterial hypertension, diabetes mellitus, severe migraine headaches, and "condition following fracture of both patellae and both wrists."  R. at 839.  Dr. Hess further reported in the statement that Walker was totally disabled from performing his regular occupation.

In all of the functional capacity assessments prepared by Dr. Quizon, particularly the forms he completed in 1990 through 1994 (the period at issue here), he consistently diagnosed Walker with hypertension, arthritis, Type II diabetes, herniated disc L4 and L5, and traumatic arthritis.  In these statements, Dr. Quizon also noted that Walker should avoid completely the majority of the activities listed in the assessment form, including sitting, assuming cramped/unusual positions, reaching (forward/overhead), repetitive movement (hands/feet), climbing (stairs/ladders/scaffolds), balancing (exposure to falling), bending/stooping/squatting, operating truck/dolly/small vehicle, heavy equipment, and electrical equipment, and performing concentrated visual attention.  Dr. Quizon concluded in all the forms that

41

Walker was totally disabled.  Additionally, in a letter dated June 7, 1991, Dr. Quizon concluded that due to his medical problems, Walker did not have the ability to perform the three occupations suggested by the long-term disability insurance carrier, occupations that qualified as light work in terms of physical demands.

As to the opinions rendered by Drs. Hess and Quizon, the ALJ noted: "These statements are accorded little weight because they are not accompanied by specific functional limitations, and relate only to the ultimate issue of disability, which is reserved to the undersigned (See Social Security Ruling 96-5p)." R. at 26.  The ALJ accordingly gave more weight to the opinions of the non-examining state agency medical consultants, all of whom found that Walker did not have any remarkable functional limitations during the relevant time period.

Certainly, Drs. Quizon and Hess's statements that Walker suffered from various ailments and was totally disabled were issues reserved to the Commissioner and therefore were not entitled to controlling authority. Frobes, 467 F.Supp.2d at 819.  "Nonetheless, the ALJ was required to evaluate [Drs. Quizon and Hess's] opinion[s] in light of the factors listed above and to provide specific reasons why [he] was rejecting [their]

opinion[s]." <u>Id.</u>  Indeed, the ALJ neither identified the evidence in the record that was inconsistent with the treating physician's opinions, nor identified "with any specificity the evidence that was lacking." <u>Id.</u>  There is medical evidence in the record supporting the treating physicians' opinions regarding the various ailments from which Walker suffered during the relevant time period, particularly Walker's problems with hypertension. The Court therefore cannot determine whether the ALJ's rejection of the treating physicians' opinions was proper.  Remand is therefore necessary on this basis.  On remand, the ALJ must articulate in detail his reasons for rejecting the opinions of Walker's treating physicians, considering all of the relevant factors outlined above.

Walker next argues that the ALJ committed reversible error by failing to explain his rationales for rejecting the testimony of Walker and his wife regarding Walker's many absences from work due to pain and that of  the vocational expert regarding the impact of such absences on Walker's ability to work. The Court agrees that remand is also warranted on this basis.

Walker stated at the hearing that he was reprimanded by his employer for his excessive absences.  Walker's wife similarly testified at the hearing that her husband frequently missed work due to back and knee pain, high

blood pressure and headaches.  At the hearing, Walker's counsel asked the

vocational expert about employer tolerances for absenteeism.  In response,

Gladden stated: "The general expectation by the Department of Labor is

two to three unexcused absences per month.  And while I have toured

Caterpillar, I don't recall asking if they have accrual of benefits for sick days

or not.  But generally speaking most unskilled types of work do not have

accrued vacation days or sick days." R. at 64-65.  On examination by the

ALJ, Gladden confirmed that two to three unexcused absences per month

would be considered excessive.

The ALJ must explain the rationale for his credibility evaluations

under SSR 96-7p, which instructs as follows:

> The reasons for the credibility finding must be grounded in the
> evidence and articulated in the determination or decision.  It is
> not sufficient to make a conclusory statement that "the
> individual's allegations have been considered" or that "the
> allegations are (or are not) credible." . . .  The determination or
> decision must contain specific reasons for the finding on
> credibility, supported by the evidence in the case record, and
> must be sufficiently specific to make clear to the individual and
> to any subsequent reviewers the weight the adjudicator gave to
> the individual's statements and the reasons for that weight.

Gilkey, 417 F.Supp.2d at 964 (quoting SSR 96-7p).

The ALJ noted in his decision that Walker's wife had testified that

Walker frequently missed work due to pain.  In his Finding No. 5, the ALJ noted that the statements of Walker and his wife relating to Walker's "subjective symptoms and functional limitations on and before December 31, 1994, are found to be generally credible, except to the extent that they may be inconsistent with the limitations listed in Finding No. 6."  R. at 28. The Court cannot glean from the above statement whether the ALJ even considered the statements of Walker and his wife that he frequently missed work due to his ailments.  The Court similarly cannot determine from the above statement whether the ALJ considered the vocational expert's statement regarding employer tolerances for absenteeism.

Moreover, the ALJ's Finding No. 5 is specifically limited by Finding No. 6, which, as noted supra, is inconsistent with the ALJ's statements in the body of the decision.  For these reasons, the Court finds that remand is necessary.  On remand, the ALJ must address his credibility findings with respect to the statements made by Walker and his wife regarding Walker's frequent absences from work due to his ailments.  The ALJ must also address the statements made by the vocational expert regarding the employer's tolerances for absenteeism.  The ALJ must lastly clarify his Finding No. 5, as it references Finding No. 6, which is contrary to the statements in the body

of the decision.

Finally, Walker asks the Court to remand the case based on the fact that the Commissioner failed to meet her burden at Step 5 of the Analysis. Walker contends that the Commissioner failed to sustain her burden at Step 5 because the hypothetical posited by the ALJ failed to fully incorporate the ALJ's own findings regarding Walker's residual functional capacity. In other words, Walker contends that the ALJ erred in improperly omitting some of his RFC findings in the hypothetical posed to the vocational expert, specifically the ALJ's conclusion in Finding No. 6 that Walker had the overall lifting ability of 10 pounds and the ability to only occasionally stand and walk. The Court agrees. This issue, however, is moot based on the above discussion that the ALJ's Finding No. 6 is inconsistent with the ALJ's statements in the body of the decision.

## CONCLUSION

THEREFORE, the Plaintiff's Motion for Summary Judgment (d/e 11) is ALLOWED, and the Defendant's Motion for Summary Affirmance (d/e 16) is DENIED. The decision of the Commissioner is REVERSED and the matter is REMANDED for further proceedings consistent with this Opinion, pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS THEREFORE SO ORDERED.

ENTER:   March 23, 2007.

FOR THE COURT:

_____ s/  Jeanne E. Scott _____
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE